TRINA A. HIGGINS, United States Attorney (#7349)
JENNIFER K. MUYSKENS, Assistant United States Attorney (DC#475353)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: Jennifer.Muyskens@usdoj.gov

---

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff,<br><br>　　　vs.<br><br>TIMOTHY GIBSON,<br><br>　　　Defendant. | Case No.  2:24mj489-DAP<br><br>COMPLAINT<br><br>COUNT 1: 18 U.S.C. § 401(3)<br>(Contempt)<br><br><br>Judge Daphne A. Oberg |

Before Daphne A. Oberg, United States Magistrate Judge for the District of Utah,

appears the undersigned, who on oath deposes and says:

### COUNT 1
### 18 U.S.C. § 401(3)
### (Contempt)

Beginning on or about June 2020 and continuing through the present, in the District

of Utah and elsewhere,

### TIMOTHY GIBSON,

defendant herein, did willfully and knowingly disobey and resist one or more lawful orders,

decrees, and commands of the Honorable Dustin Pead of the United States District Court

for the District of Utah, the Honorable Freda L. Wolfson of the United States District Court for the District of New Jersey, and the Honorable Leda Wettre of the United States District Court for the District of New Jersey, of which the defendant had actual knowledge, namely, the orders setting conditions of release in case numbers 2:22-cr-115 (District of Utah), 3:22-cr-320 (District of New Jersey), and 3:20-cr-441 (District of New Jersey). Specifically, the defendant directly and indirectly violated one or more of these orders by violating any federal, state, or local law while on release in a federal criminal case; in violation of the courts' orders and Title 18, United States Code, Section 401(3).

The elements of Count 1, a violation of 18 U.S.C. § 401(3), Contempt, are:

(1) that the court entered a reasonably specific order;

(2) that the defendant had actual knowledge of the court order;

(3) that the defendant disobeyed or disregarded the order; and

(4) that the defendant acted willfully in disobeying or disregarding the court order.

**AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT**

Complainant, Amanda Lucas, being duly sworn, hereby states that this Felony Complaint is based on information obtained through an investigation consisting of the following:

1.    I am a Special Agent with the Internal Revenue Service, Criminal Investigation, ("IRS-CI") and have been so employed since November 2021. My

responsibilities include the investigation of possible federal criminal violations, including offenses in Title 26, Title 31, and Title 18 of the United States Code.

2.      TIMOTHY GIBSON is currently on release in two federal fraud cases pending in the United States District Court for the District of New Jersey. GIBSON is on release pending sentencing, after having pled guilty to engaging in fraudulent conduct in both cases in May 2022. GIBSON resides in Lehi, Utah and is currently supervised by United States Probation Officer Morgan Wahlen with the United States Probation & Pretrial Services for the District of Utah.

**The Court Orders**

3.      On May 29, 2020, TIMOTHY GIBSON was indicted on one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349, in case number 2:20-cr-441 in the United States District Court for the District of New Jersey. The indictment alleged that the conspiracy took place from at least August 2014 through at least May 2016.

4.      On June 10, 2020, TIMOTHY GIBSON appeared before Magistrate Judge Leda Wettre for an initial appearance on the indictment in case number 3:20-cr-441. Magistrate Judge Wettre issued an Order Setting Conditions of Release. The first condition imposed by the court in its Order was: "The defendant must not violate any federal, state or local law while on release." Order, Case No. 3:20-cr-441 (ECF 57). The Order advised GIBSON that "[v]iolating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of

detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both." *Id.,* p. 3 (emphasis added). The Order was signed by GIBSON on June 10, 2020.

5. On April 4, 2022, a felony Information was filed in case number 2:22-cr-115 in the United States District Court for the District of Utah charging GIBSON with one count of Bank Fraud, in violation of 18 U.S.C. § 1344, and two counts of False Statements to a Bank, in violation of 18 U.S.C. § 1014, for conduct occurring in May 2020 in connection with fraudulent PPP loans.

6. On April 13, 2022, GIBSON appeared before Chief Magistrate Judge Dustin Pead for an initial appearance in case number 2:22-cr-115. Chief Magistrate Judge Pead ordered the continued release of GIBSON under the same conditions as his pending District of New Jersey case. A written Order Setting Conditions of Release in case number 2:22-cr-115 was issued by Chief Magistrate Judge Pead on April 13, 2022. Like the Order issued by Magistrate Judge Wettre, the first condition imposed in the Order was: "The defendant must not violate any federal, state or local law while on release." Order, Case No. 2:22-cr-115 (ECF 9). The Order further advised GIBSON that "[v]iolating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both." *Id.,* p. 4 (emphasis added). The written order was not signed by GIBSON, but the docket reflects that the

conditions of release were addressed during the hearing in which GIBSON was present. In addition, USPO Wahlen advised me that Orders Setting Conditions of Release are reviewed by the supervision officers in the District of Utah with every defendant at the start of pretrial supervision.

7. On or about April 29, 2022, pursuant to Rule 20 of the Federal Rules of Criminal Procedure, the federal case in Utah (case no. 2:22-cr-115) was transferred to the District of New Jersey and was assigned case number 3:22-cr-0320.

8. On May 16, 2022, GIBSON appeared before Chief Judge Freda Wolfson in the United States District Court for the District of New Jersey and entered a guilty plea to Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349, in case number 2:20-cr-441. As part of the guilty plea, GIBSON admitted he engaged in fraudulent conduct and agreed to pay restitution in the amount of $117,068. On that same date, GIBSON also entered a guilty plea pursuant to Federal Rules of Criminal Procedure Rule 11(c)(1)(C) to Bank Fraud, in violation of 18 U.S.C. § 1344, and two counts of False Statements to a Bank, in violation of 18 U.S.C. § 1014, in case number 3:22-cr-0320 for the fraudulent PPP loans. As part of the Rule 11(c)(1)(C) plea agreement for case number 3:22-cr-0320 only, the parties stipulated to a term of imprisonment of 24 months, and restitution of $608,138.15.

9. After accepting the guilty pleas in both criminal cases, Chief Judge Wolfson permitted GIBSON to remain in the community and ordered the previously set conditions

of release. *See* Minute Entry, Case No. 3:20-cr-441 (ECF 91). Sentencing was set for September 22, 2022. *Id.*

10.    The sentencing date for both criminal cases was continued and/or re-set multiple times and still has not taken place. In December 2023, GIBSON filed motions to withdraw his guilty pleas. Those motions are still pending and no sentencing date has been scheduled while the motions are litigated. Meanwhile, GIBSON remains on release in the community and under the supervision of USPO Morgan Wahlen pursuant to the courts' release orders.

**The Violation of Federal Law While On Release**

11.    The Internal Revenue Service (IRS) is conducting an investigation involving GIBSON (and others) promoting, selling, and using an abusive non-cash charitable contributions scheme to defraud the United States, which involves the donation of minerals to charities (hereinafter, the "Charitable Contributions Scheme"). The evidence in this case provides probable cause that the quantity and quality of minerals that are purportedly donated to charities do not exist. There is also probable cause that, from 2020 through the present, hundreds of taxpayer participants claimed deductions of hundreds of millions of dollars for these non-existent donations of minerals through the scheme promoted, sold, and used by GIBSON and others, in violation of 26 U.S.C. § 7206(2), 18 U.S.C. § 371, and 18 U.S.C. § 1343.

12.     As a result of my training and experience, I know that, under the laws of the United States, it is a criminal offense:

    a.  to willfully aid or assist in, or procure, counsel, or advise the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document, pursuant to 26 U.S.C. § 7206(2); and

    b.  for two or more persons to conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to affect the object of the conspiracy, pursuant to 18 U.S.C. § 371; and

    c.  to knowingly obtain money or property by means of false or fraudulent pretenses, representations, or promises by transmitting or causing to transmit by means of wire, radio, or television communication in interstate or foreign commerce, pursuant to 18 U.S.C. § 1343.

**The Charitable Contributions Scheme for Tax Years 2020 and 2021**

13.     For tax years 2020 and 2021, the scheme involved tax deductions for non-cash charitable contributions of magnesium chloride brine (magnesium).

14.     Promoters claimed the magnesium was purchased in bulk at a discount from a family business that held the magnesium for more than one year. A known individual and co-conspirator in the scheme ("CC-1") is the purported source of the magnesium; CC-1 is part of a family that owns a magnesium mining operation on the Great Salt Lake and a minerals nutritional supplements business.

15.     The magnesium was purportedly contributed by one identified LLC to another identified LLC for each tax year. CC-1 is listed as a 50% or greater member of the two LLCs that contributed the magnesium to the other two LLCs. Each LLC involved was created by a known individual and co-conspirator in the scheme ("CC-2") or one of his associates. (As detailed later in this affidavit, CC-2 was one of the individuals who promoted and sold participation in the scheme to undercover agents.)

16.     After allegedly obtaining the bulk quantities of magnesium, the two LLCs that received the contributions then "donated" the magnesium to an identified non-profit entity (hereinafter, "NP-1"). After these alleged donations, the donating LLCs were spun off into respective LLC series consisting of hundreds of sub-entities; the alleged non-cash charitable contributions by each of the two LLCs were then divided up among the sub-entities so the promoters could sell a piece of the alleged non-cash charitable contributions to participating taxpayers. There were approximately 645 sub-entities created in 2020-2021.

17.    Each participant (taxpayer) in the scheme was admitted as a partner into one of these approximately 645 sub-entities and issued a Form K-1 which allocated 100% of that sub-entity's share of the non-cash charitable contribution to that partner (taxpayer). The taxpayer then took a tax deduction against ordinary income on their IRS Form 1040 that was four times what he or she paid promoters to participate in the scheme. A review of IRS records reveals that, in total, taxpayers claimed tax deductions for the donations of approximately 3.8 million gallons of magnesium with an alleged FMV of $226.8 million for tax years 2020 and 2021 in connection with this scheme.

18.    A qualified appraisal is required for any taxpayer who claims a deduction for a non-cash charitable donation of over $5,000. Two appraisals were issued to the taxpayers who participated in the magnesium scheme, one for tax year 2020 and the other for tax year 2021.

19.    The 2020 appraisal appraised 1.667 million gallons of magnesium chloride brine at $59.50 per gallon for a total value of $99.19 million. The 2020 appraisal states the magnesium was acquired from a family or a member of a family that owned a mining operation, without naming the specific family or mining operation. This is consistent with the magnesium allegedly being acquired from CC-1 and/or CC-1's family business. The particular product that was appraised in the 2020 appraisal was a liquid magnesium food-grade supplement that has magnesium concentration of 80-90 mg/mL. Notably, in making its appraisal about the value of magnesium that was purportedly donated, the 2020

appraisal relied exclusively on the promoters' statements that the 1.667 million gallons of magnesium existed and had a concentration of 80-90 mg/mL. The appraiser never observed that quantity of magnesium and never tested the magnesium. The 2020 appraisal explicitly states that the appraisers did not independently verify the information provided to them about the product, nor did they verify the quantity or characteristics of the product.

20.    The 2021 appraisal appraised 3.452 million gallons of a liquid magnesium food-grade supplement that has magnesium concentration of 80-90 mg/mL at $60 per gallon for a total value of $207.11 million and stated that the magnesium was acquired from an identified business entity that is solely owned by CC-1. Like the 2020 appraisal, the 2021 appraisal of $207.11 million FMV relied exclusively on the promoters' statements that the 3.452 million gallons of magnesium existed and that it had a concentration of 80-90 mg/mL. The appraiser never observed that quantity of magnesium and never tested the magnesium. The 2021 appraisal explicitly states that the appraisers did not independently verify the information provided to them about the product, nor did they verify the quantity or characteristics of the product.

21.    In reality, apart from the statements made by the promoters of the scheme, there is no evidence that the stated volume or concentration level of the magnesium existed in 2020 or 2021, let alone was actually donated to NP-1.

22.    In 2022 and 2023, CC-1 was serving a sentence for an unrelated crime. I obtained recordings of his jail calls to family and friends and listened to those calls. In

those calls, CC-1 made a number of statements regarding the Charitable Contributions Scheme. CC-1 stated that GIBSON was his "personal point of contact" regarding the mineral scheme and that GIBSON only ever purchased 100,000 gallons of magnesium chloride brine through CC-1 and the family business. CC-1 stated that these 100,000 gallons were purchased for between $300,000 and $370,000 ($3 - $3.70 per gallon), and that the 100,000 gallons were purchased directly from the family business, not from the business entity that is wholly owned by CC-1 as the 2021 appraisal states.

23.     CC-1 also stated that GIBSON had yet to take physical possession of the 100,000 gallons of magnesium that was purchased, and that GIBSON had not yet decided what he was going to do with the magnesium. CC-1 stated that GIBSON never purchased magnesium directly from him, but that he helped GIBSON find another source for magnesium. CC-1did not state what or who this other source was. In another phone call, made in 2023, CC-1 stated that GIBSON needed to pick up magnesium that was being held on property belonging to another person.

24.     CC-1's statements contradict the claims made by the promoters of the scheme in several material aspects. First, the 2021 appraisal stated that 3.452 million gallons of magnesium chloride brine was acquired from an entity which is solely owned by CC-1. However, CC-1 stated on the recorded jail calls that only 100,000 gallons of magnesium were purchased by GIBSON, and that it was not acquired from CC-1's solely owned entity, but rather, from CC-1's family's business. In addition, the 2021 appraisal

placed the FMV of the magnesium at $60 per gallon, but CC-1 stated in his recorded calls that GIBSON purchased the 100,000 gallons for $3 - $3.70 per gallon. Further, contrary to the entire premise of the scheme – which is predicated on the donations of millions of gallons of magnesium to NP-1 in 2020 and 2021 – according to CC-1, at least as of December 2022, some or all of the magnesium that was purported to have been donated in 2020 and 2021 had yet to be physically acquired or donated to any charity.

25.    In addition, CC-1 made statements that contradict the purported high concentration of the magnesium. Both the 2020 appraisal and the 2021 appraisal state the appraisal is for magnesium with a concentration of 80-90 mg/mL. In a July 2023 phone call, CC-1 stated that the 100,000 gallons has a magnesium concentration that is "a little bit greater concentration than Great Salt Lake water." I interviewed a scientist at Utah Department of Natural Resources. According to the scientist, the magnesium concentration of the lake water where CC-1's family has their mining operation is about 10 mg/mL. The appraisals are premised on a concentration that is 8 to 9 times higher (and significantly more valuable) than the apparent source of the only known purchase of magnesium by promoters of the scheme.

26.    The investigation has uncovered no other evidence of the existence of magnesium owned or controlled by the promoters of the scheme beyond the 100,000 gallons that CC-1 stated was purchased, and no evidence that any magnesium with a concentration of 80-90 mg/mL is owned or controlled by the promoters of the scheme.

27.    In addition to the lack of evidence supporting the existence of more than 3 million gallons of high concentration magnesium, evidence regarding NP-1 (the charity that received the purported charitable contribution in 2020 and 2021) further establishes probable cause that the scheme is fraudulent.

28.    A web search and review of IRS documents for NP-1 reveals the organization was founded and is operated by a known individual and co-conspirator ("CC-3") and her husband. CC-3 is a tax attorney. The web search and review of IRS documents indicate there are not and have never been any employees of NP-1 and that CC-3 and her husband are the only individuals involved with operating the organization.

29.    NP-1's IRS Forms 990 (which document the charitable contributions it received) reflect that, in the years leading up to the scheme, NP-1 had never received any substantial contributions. The 2020 and 2021 Forms 990 show the contributions received for the past five years: 2019, 2018, 2017, and 2016 reflect contributions of $47; $42; $82; and $38, respectively. A Form 990 is only required if the annual charitable contributions were more than $50,000. For all the tax years prior to 2020, NP-1 had only filed Forms 990-N, which is the form required to be filed for non-profit organizations with less than or equal to $50,000 in annual contributions.

30.    NP-1's Forms 990 reflect a radically different story for 2020 and 2021. In 2020, NP-1 claimed it received charitable contributions of $45,193,239. In 2021, NP-1 claimed it received charitable contributions of $148,977,988. The year 2020 was the first

year since at least 2016 that it received more than $82 in annual charitable contributions. The 2020 Form 990 reports NP-1 received magnesium with a FMV of $45,159,508 million from 122 contributors during 2020. The 2021 Form 990 reports that NP-1 received magnesium with a FMV of $148,812,515 from 390 contributors during 2021. These amounts suggest NP-1 claimed to have received donations of 2.48 million gallons of magnesium in 2021 and about 759,000 gallons in 2020, a total of approximately 3.24 million gallons with a FMV of $193.97 million for both years. Notably, a 501(c)(3) charity that receives cash or non-cash contributions that relate to the mission of the charity is not required to pay taxes on these assets.

31.     During a June 20, 2023 recorded phone call between CC-1 and his brother, (who is also connected to the family mining business), the brother told CC-1 that GIBSON told the brother to find a "front for donations."

32.     I interviewed several witnesses who filed a whistleblower complaint with the IRS in August 2023, claiming that GIBSON and others were committing tax fraud involving alleged donations to charities. The witnesses reported that they were hired by GIBSON in early 2021 to assist in marketing the magnesium. One witness stated that "GIBSON is selling 'investments' that are purportedly obtaining products which are not purchased, but which are being claimed as donated." The witness provided the IRS with text conversations between himself, GIBSON, CC-2, and another witness. These text conversations occurred between mid and late 2021, and corroborate the witness's claims.

The text conversations show GIBSON and CC-2 pressing the witnesses to make CC-1 work with the appraiser to get the appraiser what he needs to complete the appraisal of the magnesium. In a November 1, 2021 text conversation between GIBSON and the witnesses regarding the magnesium and the 2021 appraisal, GIBSON stated, "We are not buying anything . . . [CC-1] just has to have the ability and ownership through agreements."

33.    The witness provided multiple emails sent to him from GIBSON about the mineral scheme from 2020 through early 2022. For example, GIBSON sent an email from to a witness on October 19, 2020 with subject line "Mineral Event: Wednesday Oct 21st 4-6pm WeWork Lehi," inviting the witness to a meeting about minerals. This same email contained the following statement by GIBSON: "With the current valuation, investors would buy minerals (not as securities but as owners of minerals), at a price of about 25% of the current appraised value . . . [to] yield a $200,000 tax deduction for up to 30% of their AGI."

**The Charitable Contributions Scheme for Tax Years 2022 and 2023**

34.    The tax scheme for tax years 2022 and 2023 has the same basic structure as the scheme for 2020 and 2021, but involves the donation of volcanic ash rather than magnesium. Like in the magnesium scheme, the volcanic ash is claimed by promoters in promotional material and during an undercover operation to have been purchased in bulk at a discount from a family business that has held the product for more than one year. And, once again, promoters advertise a tax deduction that is four times the value of each participant's cash purchase.

35.     An identified entity making the non-cash charitable contribution of volcanic ash in 2022 (hereinafter referred to as "The ASH LLC") is connected to GIBSON through a location address; GIBSON has used the same address on tax returns in recent years as the address for multiple businesses he owns. The ASH LLC purported to have donated 300,000 tons of volcanic ash to an identified non-profit entity ("NP-2") in 2022, for the purported use as a soil amendment in Haiti.

36.     As in the magnesium scheme, The ASH LLC was divided into a series of sub-entities with each taxpayer participant purchasing an ownership interest in a sub-entity and taking 100% of that sub-entity's non-cash charitable contribution of volcanic ash on his or her Form 1040. A search of IRS Forms SS-4 indicates that 491 sub-entities were created in 2022, and 925 sub-entities were created in 2023. Participants in this scheme claimed a total of $159.7 million in deductions for non-cash charitable contributions of volcanic ash for the 2022 tax year, and it is estimated the deductions for the 2023 tax year will be $311 million.

37.     According to the scheme's promotional material, a trust ("TRUST-1") owns the land where the volcanic ash was mined from and the land is identified as 8,000 acres in Millard County, Utah. TRUST-1 first applied for a tax identification number in 2022, the same year the volcanic ash scheme began, and the trustee of TRUST-1 is a known associate of GIBSON. (GIBSON and the trustee were subjects of the same bankruptcy fraud investigation in Tennessee in 2022 and 2023, wherein the trustee filed a wrongful

lien on a home that was owned by an individual that owed money to GIBSON.) An examination of the documents filed by the trustee with the Millard County Assessor's Office – (which the Millard County attorney described as a "bogus filing" to try to claim land owned by the State and others based on 19th century federal land patent documents) – show that GIBSON signed as a witness on a quitclaim filed as part of the illegal "land grab" of just over 8,000 acres in Millard County.

38.     My investigation uncovered two appraisals for the volcanic ash: one for tax year 2021 issued in August 2022 and the other for tax year 2022 issued in March 2023, both of which appraise 300,000 tons of volcanic ash obtained by The ASH LLC.

39.     The 2021 appraisal appraised the 300,000 tons of volcanic ash at $216 million. The 2021 appraisal does not indicate the source of the volcanic ash; however, a promoter's website where this appraisal was obtained from claimed the volcanic ash is sourced from 8,000 acres in Millard County, Utah, which is consistent with TRUST-1's attempted "land grab" (to which GIBSON signed as a witness on documents) in Millard County. The 2021 volcanic ash appraisal indicated the appraisal is to provide a valuation for the purpose of a charitable contribution of the volcanic ash, and a promoter's website indicated the non-profit slated to receive the donations in 2022 was an identified Haitian non-profit that obtained its 501(c)(3) status in 2022 (hereinafter, "NP-3"), and is different than the scheme's promotional material that NP-2 was the charity that received the volcanic ash donations.

40. The 2022 appraisal, issued in March 2023, seven months after the 2021 appraisal, appraised 300,000 tons of volcanic ash purportedly obtained by The ASH LLC at $196.4 million. The 2022 appraisal claims the donation was made to NP-2 in 2022. This appraisal states the volcanic ash was sourced from Stansbury Island on the Great Salt Lake (in Tooele County, Utah), and not Millard County. This appraisal was made after the attempted "land grab" in Millard County by the trustee of TRUST-1 failed.

41. To learn more about the likelihood that volcanic ash of the quantity and value was obtained by The ASH LLC, I interviewed a mining scientist with the Utah Department of Natural Resources in July 2023. The mining scientist advised that neither Millard County nor Stansbury Island could be the source of 300,000 tons of volcanic ash, as there have not been any mines in either of those areas capable of producing such a volume of that type of mineral.

42. In addition to the lack of evidence supporting the existence of 300,000 tons of volcanic ash mined from either Millard County or Stansbury Island, evidence regarding the non-profit entities that purportedly received these charitable contributions further establishes probable cause that the scheme is fraudulent.

43. NP-3, the entity that was slated to receive the 2022 donations (per the 2021 appraisal), was created in October 2020. NP-3 has only ever filed one Form 990, for tax year 2021, which was a Form 990-N indicating it received charitable contributions of no more than $50,000 for that year.

44.     NP-2 is the entity that purportedly received 300,000 tons of volcanic ash in 2022, valued at $196.4 million (according to the 2022 appraisal). NP-2 was created in 2012. NP-2 has only ever filed Forms 990-N since its creation, which indicates it has never had charitable contributions of more than $50,000 in any year. Volcanic ash in the amount of 300,000 tons with a FMV of $196.4 million was claimed in the 2022 appraisal to have been donated to NP-2 during the 2022 tax year, yet NP-2 only filed a Form 990-N for tax year 2022 as well, reflecting it did not receive contributions of more than $50,000 in 2022. NP-2 has never issued any Forms W-2, which suggests it has never had any employees.

45.     As learned during the undercover operation for this investigation, the charity that was the recipient of the volcanic ash in this scheme for the 2023 tax year was another non-profit ("NP-4"). NP-4 received its EIN and 501(c)(3) status in 2011, and is identified in public source material as an affiliate of another non-profit ("NP-5"). Since 2011, NP-4 has only ever filed Forms 990-N, indicating it has never received more than $50,000 in charitable contributions in any year. NP-4 has never issued any Forms W-2, which suggests it has never had any employees.

46.     Beyond the promoters' statements, the investigation has uncovered no evidence of the existence of any quantity of volcanic ash nearing the quantities that were appraised to have ever been owned or controlled by the promoters of the scheme.

47.     In a phone call on July 11, 2023 between a confidential informant and an identified promoter and co-conspirator in the scheme ("CC-4"), CC-4 explained the

Charitable Contributions Scheme. CC-4 stated a client can buy magnesium or volcanic ash for a certain price and then contribute the product to a charity, taking a large charitable tax deduction. CC-4 went on to say the value of the deduction would be much higher than the actual cost the client paid to participate, and this would result in tax savings for the client.

48.     A review of bank records for a business entity connected to GIBSON, Develop My Business LLC, shows a connection to the Charitable Contributions Scheme. GIBSON and his spouse are listed as members for the bank account, with a known associate of GIBSON's listed as the signor. The January 2022 bank statement for this account includes four transfers from the law firm connected to the scheme (hereinafter, "THE LAW FIRM"). The four transfers total $1.35 million, and each transfer includes in the description "Ref: Minerals Ventures LLC".[1] The bank statements also show payments going out to numerous individuals and entities also known to be involved in the Charitable Contributions Scheme, including but not limited to: a wire on May 11, 2021 to CC-1's entity for $40,000; a check dated June 3, 2022 to the CEO of NP-5, for $3,000; a July 1, 2022 wire to NP-1 for $43,388; a January 6, 2023 wire to NP-5 for $150,000; and a January 5, 2023 wire of $300,000 to an entity controlled by the trustee of TRUST-1 (the trust that claimed to be the source of the volcanic ash).

---

[1] Participants in the scheme are instructed to make their payments to THE LAW FIRM's bank account with reference "Minerals Ventures," as evidenced by documents obtained from a taxpayer and participant in the scheme that was audited by an IRS Revenue Agent for tax year 2021.

**The Undercover Operation**

49.    The IRS conducted an undercover operation are part of its investigation. IRS Criminal Investigation Special Agents, acted in an undercover capacity. One undercover agent played the role of a CPA ("UC-1") and the second undercover agent played the role of the CPA's wealthy client who was looking to reduce tax liability ("UC-2"). UC-1 and UC-A engaged in conversations with CC-2, CC-4, a third known co-conspirator ("CC-5") and one of their employees. Through these interactions, IRS obtained statements and documents about the Charitable Contributions Scheme.

50.    On July 17, 2023, UC-1 received an email from CC-5. CC-5 stated in the email that he is "happy to schedule time to discuss our leveraged tax deduction strategy which will help reduce your year-end taxes." ("Leveraged Deduction Transaction strategy" is the name used by promoters for the Charitable Contribution Scheme.)

51.    During the August 2, 2023 Zoom call, CC-5 explained the "Leveraged Deduction Transaction" strategy as a way to lower taxes on ordinary income and that it is done through bulk acquisitions and charitable donations. He identified magnesium as the mineral involved in the strategy during past years and volcanic ash as the mineral involved currently. CC-5 explained that a client can buy into the strategy by joining a partnership that has held the asset for more than one year and then the partnership donates the asset to charity; thus, enabling the client to deduct the charitable contribution of the asset at the FMV of the asset, not at the amount the client paid to participate in the strategy. CC-5 stated the "volcanic ash is approximately four times leveraged" and gave an example where

a person pays $75,000, giving them a deduction of $300,000, resulting in tax savings of $150,000. The client wires the money to an attorney's trust account where it is held in escrow; at the end of the year, the money is released and the minerals are purchased; the minerals are sent to the charity; the charity provides an acceptance letter; and the client gets their K-1 in February. He also adds that referral partners get 10% of the proceeds from clients they refer.

52.     A phone call between the UC-1 and CC-4 took place on August 30, 2023 in which CC-4 provided information about the Leveraged Deduction Transaction strategy.

53.     On December 1, 2023, UC-1 wired $50,000 to THE LAW FIRM's IOLTA account to participate in the Leveraged Deduction Transactions strategy, as instructed. UC-1 was subsequently provided with several documents through the promoter's online portal, including one titled *2023 Assignment of Property for an Interest in [LLC name] Series NO 271*. Said document purports that UC-2 is buying an interest in a sub-entity that will hold 611,004 lbs. of volcanic ash, and another titled *2023 Transfer by Gift of an Interest in Minerals to an IRC 5019c)(3) Charity* indicates [LLC name] Series NO 271 will convey and assign its ownership rights in the minerals to a particular non-profit and/or one of its affiliated charities. NP-5 is the identified non-profit that will receive the volcanic ash in the documents provided to UC-1 and UC-2 via interstate wire communication. NP-5 is the same entity that received the January 6, 2023 wire of $150,000 from the bank account of Develop My Business LLC, for which GIBSON and his wife are members on that account.

54.     In a phone call between CC-5 and a UC-1 on April 26, 2024, CC-5 explained that the pending appraisal of the volcanic ash should be provided to UC-1 and UC-2 within 30 – 60 days, reflecting that the scheme remains on-going at this time.

55.     On May 9, 2024, an undercover IRS agent involved in an undercover operation targeting a promoter of the Charitable Contributions Scheme received a Zoom link to attend a video call. The purpose of the video call was to respond to questions posed by the undercover agent about the volcanic ash donations in which the agent raised questions about the existence of the volcanic ash. The email sending the Zoom link was sent by the promoter's wife. The email was sent to only three people: the promoter, the undercover agent, and GIBSON at his personal email address. Ultimately, GIBSON's relative (not GIBSON) attended the Zoom call.

56.     Based on the foregoing, I respectfully submit there is probable cause to believe that GIBSON (and others) committed violations of 26 U.S.C. § 7206(2), 18 U.S.C. § 371, and 18 U.S.C. § 1343 beginning in 2020 and continuing through the present through their promotion, sale, and use of the Charitable Contributions Scheme. I further submit there is probable cause that GIBSON's participation in this scheme took place during the entirety of the time that he was on pretrial release in case number 3:20-cr-441, and while under a clear and specific court order not to violate any federal law. Finally, I submit there is probable cause that GIBSON's participation in this scheme took place during the entirety

of the time that he was on pretrial release in case numbers 2:22-cr-115 and 3:-22-cr-320, and under clear and specific court orders not to violate any federal law.

57.     I am familiar with the facts and circumstances alleged in this complaint.

Based on the foregoing information, I respectfully request an arrest warrant be issued for **TIMOTHY GIBSON** for a violation of 18 U.S.C. § 401(3), Contempt.

_____
Amanda Lucas, Affiant
Special Agent
Internal Revenue Service, Criminal Investigations

SUBSCRIBED AND SWORN TO BEFORE ME this 13th day of May 2024.

_____
DAPHNE A. OBERG
United States Magistrate Judge

APPROVED AS TO FORM:

TRINA A. HIGGINS
United States Attorney

*/s/ Jennifer K. Muyskens*

_____
Jennifer K. Muyskens
Assistant United States Attorney